NORTH VALLEY METABOLIC LABORATORIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
North Valley Metabolic Laboratories v. Commissioner
Docket No. 5537-72.
United States Tax Court
T.C. Memo 1975-79; 1975 Tax Ct. Memo LEXIS 293; 34 T.C.M. (CCH) 400; T.C.M. (RIA) 750079; March 26, 1975, Filed Wareham Seaman, Jr., for the petitioner. Randall G. Dick, for the respondent. QUEALY
MEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: The respondent has determined deficiencies in the income tax of petitioner for the taxable years 1968 and 1969 in the amounts of $ 6,572.15 and $ 11,371.63 respectively. Due to concessions by the parties, the sole question before the Court is whether petitioner is liable for the surtax under section 531 [1] for the taxable years in question as having been availed of for the purpose of avoiding income tax with respect to its sole shareholder by permitting its earnings and profits to accumulate instead of being divided and distributed. *295 FINDINGS OF FACT Some of the facts have been stipulated. Such facts and the exhibits attached thereto are incorporated herein by this reference. Petitioner is North Valley Metabolic Laboratories (hereinafter referred to as "petitioner"), a corporation organized under the laws of the State of California and having its principal place of business in Chico, California. Petitioner timely filed its corporate income tax returns for the taxable years 1968 and 1969 with the district director of internal revenue, San Francisco, California. During the years in question, petitioner operated a clinical pathological laboratory, having eight or nine employees on its payroll. Its sole shareholder, manager and president was Dr. Kenneth J. Poppen, (hereinafter referred to as "Dr. Poppen"), a specialist in pathology licenced to practice medicine under the laws of California. Dr. Poppen formed petitioner in 1963 to eliminate the financial burdens of taking new partners into an ongoing medical practice which involved both the clinical and anatomical aspects of pathology. Specifically, *296 a new partner would often be unable to contribute his required percentage of the partnership's net worth as a result of the expensive equipment attributable to the clinical practice. By incorporating the clinical part of his practice, Dr. Poppen was able to bring in new partners without having to require a large entry fee. In addition, the corporate form enabled Dr. Poppen, to a limited degree, to engage in the solicitation of customers, a practice otherwise prohibited to medical doctors. [2]
Prior to petitioner's formation, Dr. Poppen had engaged in the practice of both clinical and anatomical pathology in an individual capacity. By 1963, he had established working contracts with twelve different hospitals. During the years in question, Technicon Leasing Company (hereinafter referred to as "Technicon") was petitioner's primary supplier of medical equipment and accessories. In August of 1967, petitioner acquired an Auto-analyzer Model 1230 (hereinafter referred to as "1230 Model") from Technicon at a cost of $ 30,000. This machine performed approximately 30 chemical tests *297 per hour. Shortly after the delivery of the 1230 Model, petitioner received an announcement from Technicon revealing the introduction of a new Sequential Multiple Auto Analyzer, SMA 1260 (hereinafter referred to as "1260 Model"). This machine was an updated version of the old 1230 Model, capable of performing twice as many tests at less than one-quarter the chemical cost. Dr. Poppen immediately objected to Technicon that petitioner had been induced to purchase the 1230 Model just prior to when the company was ready to place a newer and more advanced model on the market. Dr. Poppen claimed petitioner had never been informed of the existence of the new model at the time of its purchase. In November of 1967, Technicon responded that it was willing to allow petitioner $ 12,000 as a trade-in allowance for its 1230 Model against a quoted purchase price of $ 67,000 for the 1260 Model. Petitioner rejected this offer due to the economic loss it would sustain on the exchange. By deferring the decision on the purchase, petitioner also considered the benefit of allowing the new machine some "bench time" on the market so that any wrinkles in its performance could be rectified. At a meeting *298 held on January 11, 1968, the Board of Directors of petitioner authorized the establishment of a savings account to accumulate funds for the prospective purchase of new equipment which would result in petitioner having a fully automated laboratory. The minutes of the meeting stated, in pertinent part, as follows: The secretary reviewed the most recent financial report as of November 30, 1967 and reviewed the projected operations to the year end. It was estimated that there would be a net income of approximately $ 23,000.00 and that 1968 operations could be expected to improve considerably. President Poppen indicated that there is a need for the purchase of additional automated equipment for the laboratory in the near future. It was felt that the corporation should set aside funds necessary to make this purchase. While the full cost is not presently known it was felt that at this time a savings account at Chico Savings and Loan should be earmarked for accumulation of funds for such purchase. Initially $ 10,000.00 would be transferred to this account and additional amounts be set aside as they become available. Some short term investments could be made at the discretion of the board *299 but with the understanding that they are specifically earmarked for equipment purchase. Pursuant to the above meeting, a savings account was opened on January 10, 1968 with Allstate Savings and Loan Association for $ 10,000 to be used for the purpose of purchasing various equipment or making deposits thereon. The account's closing balance as of the end of 1968 was $ 24,300.62. At the Board of Directors' meeting held February 18, 1969, petitioner's need for additional automated equipment was further discussed: A detailed review of the 1968 financial statement was made indicating the income for the year was considerably above that of previous years. The net income for 1968 amounted to $ 52,700.00. This represents an increase of $ 19,100.00 over the previous year. One of the major reasons for the increased income was approximately a 50% increase in clinical fees. The cost of the laboratory did not increase proportionately so that the clinical laboratory net income raised from $ 17,200.00 to $ 43,600.00. Concern was expressed that there may, however, still be the need for purchase of the additional automated equipment that has been previously discussed. While figures are not *300 available President Poppen would estimate that we may need up to $ 50,000.00 for this equipment. It may be this equipment would be purchased by Enloe Hospital rather than by the clinical laboratory but there was no assurance that the hospital was in a position to do this. As such the President recommended that we continue to set aside funds for purchase of such equipment. As of the end of 1969, petitioner's balance in its Allstate Savings and Loan Association stood at $ 46,567.13. Petitioner eventually purchased the 1260 Model from Technicon in July of 1971 at a cost of $ 76,387.50. Subsequently, in November of 1972, petitioner placed an order with Technicon for the most advanced auto-analyzer then available, the SMAC, at an invoice cost of $ 192,859.80. This machine had yet to be delivered to petitioner as of the date of trial. For the taxable years 1964 to 1969, inclusive, the results of petitioner's operations were as follows: North Valley Metabolic Laboratories Comparative Profit and Loss Statement [3] 1964 - 1969 *301 1964
1965
1966
1967
1968
1969
Gross Receipts
$ 85,402
$ 121,196
$ 141,231
$ 164,021
$ 210,036
$ 251,458
Less: Overhead
Expenses
Compensation of
2,918
3,214
7,324
Officers
Salaries & Wages
36,105
51,399
57,505
67,299
68,441
79,340
Depreciation
3,205
4,071
4,610
7,098
10,561
11,163
Re nt
3,805
4,920
5,200
9,763
9,768
10,248
Taxes
2,034
6,054
7,343
8,587
8,921
13,566
Miscellaneous
17,762
30,179
43,481
46,070
54,115
71,285
Total Expenses
$ 62,911
$ 99,541
$ 118,139
$ 138,822
$ 155,025
$ 192,926
Operating Profit
22,491
21,655
23,092
25,199
56,011
58,532
Other Income
3,905
4,199
5,083
(292)
2,053
Net Profit
26,396
25,854
28,175
24,907
56,011
60,585
Federal Taxes
5,756
5,186
6,808
3,097
22,218
24,495
Net Profit After
$ 20,640
$ 20,668
$ 21,367
$ 21,810
$ 33,793
$ 36,090
Taxes
The assets and liabilities of petitioner per books from 1964 to 1969, inclusive, were as follows: North Valley Metabolic Laboratories Comparative Balance Sheet 1964 - 1969 [4]
*302 ASSETS
1964
1965
1966
1967
1968
1969
Cash
$ 24,216
$ 39,155
$ 20,210
$ 18,429
$ 36,763
$ 69,900
Accounts
16,971
17,552
15,452
11,633
Receivable
(Poppen)
Accounts
12,764
(254)
13,541
Receivable
(Others)
Other Current
47
166
4,455
7,579
7,535
7,800
Assets
Fixed Assets
33,766
44,372
46,782
80,616
83,546
92,339
Less: Accumulated
Depreciation
(19,514)
(23,017)
(26,972)
(34,020)
(44,581)
(55,744)
Real Estate
69,777
69,777
69,777
69,777
Miscellaneous
1,400
1,400
1,400
26,402
38,811
Total Assets
$ 38,515
$ 79,047
$ 146,515
$ 158,979
$ 204,616
$ 221,883
LIABILITIES AND
CAPITAL
Accounts Payable
448
5,165
832
1,026
1,187
5,301
Income Taxes
3,097
22,218
18,131
Payable
Loans From
11,725
10,471
Stockholders
Real Estate
Mortgage & City
Bonds Payable
48,231
44,501
40,884
33,668
Deferred Income
16,971
17,552
15,452
11,633
Capital Stock
10,471
10,471
10,471
10,471
Retained Earnings
26,342
46,440
69,429
84,432
118,223
154,313
Total Liabilities
and Capital
$ 38,515
$ 79,047
$ 146,515
$ 158,979
$ 204,616
$ 221,883
From its inception *303 through the taxable year 1973, petitioner did not pay out any dividends to its sole shareholder, Dr. Poppen. In March of 1966, petitioner purchased two lots of real property in Chico, California at a cost of $ 70,310. The parcels were purchased because of its proximity to Chico Community Memorial Hospital. Petitioner considered this to be an ideal location for a new medical building, the construction of which was being actively considered by the corporation at that time. It was also hoped that the hospital would provide a new source of revenues for the corporation. In 1967, however, petitioner abandoned its new office plans due to internal difficulties and signed a new ten-year lease on its existing facilities. Petitioner subsequently attempted to sell the two lots but was unsuccessful. The parcels were finally sold in 1972 for $ 99,300. On April 21, 1972, pursuant to section 534(b), respondent notified petitioner of its intention to assert an accumulated earnings tax with respect to its taxable years 1968 and 1969. Petitioner failed to file a sworn statement pursuant to section 534(c) setting forth the business reasons for its accumulation of earnings and profits. In response *304 to a motion filed by respondent pursuant to Rule 142(e) of the Court's new Rules of Practice and Procedure, this Court ordered on July 18, 1974 that the burden of proof was upon petitioner to show that its earnings and profits were accumulated for reasonable business needs. OPINION The sole question presented for our decision is whether petitioner was availed of for the purpose of avoiding income tax with respect to its sole shareholder within the meaning of section 532 by permitting its earnings and profits to be accumulated instead of being divided and distributed. [5] If so, petitioner is subject to a surtax on its accumulated earnings and profits as provided by section 531. [6]
*305 Whether petitioner has been availed of for the purpose proscribed in section 532 is necessarily a question of fact. Helvering v. Nat. Grocery Co.,304 U.S. 282 (1938); Bremerton Sun Publishing Co.,44 T.C. 566 (1965). In this regard, each case must stand or fall on its own merits. The fact that the earnings of a corporation have been permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid income tax with respect to its shareholders unless the corporation proves to the contrary by a preponderance of the evidence. See Section 533. [7] The term "reasonable needs of the business" encompasses both the present and reasonably anticipated future needs of the business. Section 1.537-1(a), Income Tax Regs.
*306 Looking to the facts, we find that petitioner did not accumulate its earnings and profits beyond its present and reasonably anticipated future needs. The volume of petitioner's business was rapidly increasing both prior to and during the years in question. The increase in volume compounded for the years 1966 through 1969 was 80 percent, computed as follows: Percentage Increase
Year
Gross Receipts
over Prior Year
1966
$ 141,231
16.5%
1967
164,021
16.0%
1968
210,036
28.0%
1969
251,458
19.5%
Volume Increase Compounded 1966-1969 80.0% In order to maintain this growth the petitioner had to be competitive. This required keeping up-to-date with the latest technological advances in the auto-analyzer field. Cf. Dill Manufacturing Co.,39 B.T.A. 1023 (1939), and Newman Machine Co.,26 T.C. 1030 (1956). Acquisition of this more advanced equipment required an additional expenditure of funds greatly in excess of the cost of the earlier models. From 1967 to 1972, Technicon marketed no less than three different auto-analyzer machines, the 1230 Model, the 1260 Model, and the SMAC. Each machine updated the former model *307 in both speed and performance. While petitioner purchased the 1230 Model at a cost of $ 30,000, the 1260 Model, and the SMAC machines carried an invoice price of $ 76,387.50 and $ 192,859.80, respectively. The SMAC machine thus represented an increase in cost of between six and seven times the original cost of the 1230 Model. Respondent contends that petitioner's intent to automate its laboratory and to purchase the most updated auto-analyzer equipment was too vague to justify any accumulation of earnings during the period in question. He further maintains that petitioner did not have "specific, definite and feasible" plans for the use of such accumulations as required by the statute. See section 1.537-1(b), Income Tax Regs.
Small closely held corporations cannot be held to the same strict formalities as the large public corporation. Bremerton Sun Publishing Co.,supra, and John P. Scripps Newspapers,44 T.C. 453 (1965). The minutes of the Board of Directors' meetings in both 1968 and 1969 state a definite intent on the part of the petitioner to accumulate funds for the purchase of new laboratory equipment. An account was established at Allstate *308 Savings and Loan Association specifically for this purpose. On the basis of the facts before us, we find that the requirements of the above regulations have been adequately satisfied. In any event, however, it must also be recognized that the advances in the art made it necessary, irrespective of any plan, for the petitioner to set aside funds in order to update its equipment as a part of the reasonable needs of the business. Furthermore, petitioner did in fact make good on its intentions. It purchased the 1260 Model in 1971 and placed an order for the SMAC in 1972. Although these purchases were made after the period in question, subsequent events may be considered by the Court in appraising presently stated intentions. Petitioner's delay in purchasing the 1260 Model and the SMAC was not such as to vitiate the reasonableness of its accumulations during the years in question. We are not unmindful that as events subsequently developed in later years, petitioner may well have permitted its earnings and profits to accumulate beyond the reasonable needs of its business. This is so even taking into account the large outlays petitioner made to update its equipment. Certainly, there can *309 be no question that petitioner's liquidity position was significantly enhanced by the sale of its two lots in 1972 for $ 99,300. These later years, however, are not before the Court. [8]
It must be recognized that petitioner was incorporated only a few years prior to the period in question with a modest capitalization. Petitioner is entitled to set aside its earnings in anticipation of future growth, particularly where the business is highly competitive and the state of the art is advancing rapidly. We are satisfied that prudent business judgment required the retention by petitioner of its earnings during the *310 years in question. In view of the credit provided by section 535(c)(1) and our determination that petitioner's earnings and profits were not accumulated in excess of its current and future business needs, it becomes unnecessary for us to consider whether petitioner was availed of for the purpose proscribed in section 532. See John P. Scripps Newspapers,supra.
In accordance with the above, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. Under the laws of California, clinical pathology is not considered to be the practice of medicine.↩
3. The parties have erroneously stipulated the total overhead expenses for both 1967 and 1968 to be $ 5 in excess of the correct amount. In addition, the parties have erroneously computed the operating profit for 1968 to be $ 1,000 in excess of the correct amount. The opinion does not make any adjustments on account of these errors.↩
4. In stipulating the balance sheet figures for 1966 and 1969, the parties have made certain errors in computation. This opinion does not make any adjustment on account thereof.↩
5. SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX. (a) General Rule.--The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed. ↩
6. SEC. 531. IMPOSITION OF ACCUMULATED EARNINGS TAX. In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of-- (1) 27 1/2 percent of the accumulated taxable income not in excess of $ 100,000, plus (2) 38 1/2 percent of the accumulated taxable income in excess of $ 100,000.↩
7. SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX. (a) Unreasonable Accumulation Determinative of Purpose.--For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.↩
8. We do not view these lots to be a proper source of working capital during the period in question. There is no dispute that the original purchase of these lots in 1967 was bona fide. Petitioner fully intended to construct a medical building thereon. Once such plan was subsequently abandoned, petitioner made a bona fide effort to sell this property, albeit unsuccessfully. No more could have been demanded of petitioner under these circumstances. Certainly petitioner could not have been required to dispose of such property by forced sale, nor does respondent so contend.↩